IN RE ESTATE OF BUDDIE STULL, ALSO KNOWN AS
BUDDIE WILLIAM STULL, DECEASED.
ROBERT ANDERSON ET AL., APPELLANTS,
V. E. MICHAEL SLATTERY ET AL., APPELLEES.
593 N.W.2d 18

Filed April 20, 1999.    No. A-98-129.

Thomas B. Thomsen, of Sidner, Svoboda, Schilke, Thomsen, Holtorf, Boggy & Nick, for appellants.

William R. Reinsch, of Reinsch & Slattery, P.C., for appellee Slattery.

MUES, INBODY, and CARLSON, Judges.

MUES, Judge.

## I. INTRODUCTION

Attorney E. Michael Slattery filed a will contest challenging two charitable bequests on behalf of a residuary beneficiary, Rosie Wolski. Slattery reached settlement agreements with the two charities which resulted in a substantial increase in the residuary estate. Slattery then sought attorney fees from the settlement funds based on the common fund doctrine. The trial court awarded Slattery one-third of the estimated settlements. Several members of the residuary appeal from that decision. For the reasons set forth below, we affirm in part, and in part reverse and remand with directions.

## II. BACKGROUND

On November 13, 1997, Slattery filed a petition for distribution of funds and an application for the payment of attorney fees

from the estate of Buddie Stull, also known as Buddie William Stull. Slattery alleged that his services had been retained by Wolski to challenge certain charitable bequests of real property to Midlands Community Foundation (Midlands) and Nebraska Methodist Hospital Foundation (Methodist). Slattery further alleged that on behalf of the entire residuary of heirs, he had entered into settlement agreements with both Midlands and Methodist and that said agreements had been approved by the court. Slattery claimed that his efforts resulted in a benefit to the residuary beneficiaries of $98,500.96. Slattery further claimed that under the common fund doctrine, he was entitled to recover attorney fees from the settlement proceeds. Slattery prayed that the court enter an order providing for payment of attorney fees of $32,890.65, or one-third of the amount recovered, plus costs of $57.

Several members of the residuary, Harriett Holman, Valeria Safarik, and the copersonal representatives of the estate of Harriett Anderson (hereinafter these three residuary members will collectively be referred to as the "objectors"), objected to the application for attorney fees. The objectors alleged that the common fund doctrine was inapplicable to the facts at hand and that the attorney fees requested by Slattery were not fair and reasonable.

Trial on the matter was held December 3, 1997, and the following facts were adduced:

Stull died on July 24, 1995. Stull devised a parcel of land to Midlands and another parcel of land to Methodist. The will has not been made a part of our record. However, the testimony indicated that there were some valuable assets beneath the soil of the land and that the will provided that the land could not be "dredged or sold in any way." The will set forth other specific devises and further provided that the remainder would go to the residuary of which Wolski was a one-third beneficiary. The record is unclear as to how many other residuary beneficiaries there were.

Wolski subsequently retained Slattery to challenge the will and paid him a $1,500 retainer. Slattery initially challenged the will on the theory that Stull was not competent at the time he executed the will. Several months later, "it became obvious that

[they] weren't going to prevail" under this theory. After conducting some "discovery type process," Slattery obtained a copy of the will and decided to pursue a different approach. Slattery filed a second action challenging the charitable bequests on the ground that the bequests violated the rule against perpetuities. Our record does not contain either of these pleadings. When Slattery was preparing the second petition, there was concern that Wolski was without sufficient funds to proceed further in the matter. Accordingly, Slattery and Wolski "elected to enter into [a] contingency arrangement" in which Wolski agreed to pay Slattery one-third of any amounts recovered.

Eventually, Slattery began settlement negotiations with Midlands and Methodist. During this time, Wolski would occasionally come to Slattery's office. Because Wolski could not drive, she was frequently accompanied by Holman. According to Slattery, Holman would frequently ask questions while she was at his office and would occasionally telephone with questions regarding the estate. Slattery testified that Holman also came in on her own or with other family members.

Slattery eventually was able to reach settlement agreements with both Midlands and Methodist. The agreements essentially provided that the land would be sold and that the charitable beneficiaries would receive 60 percent of the sale proceeds and the remaining 40 percent was to go to the residuary estate. An evidentiary hearing was then scheduled to obtain court approval of the agreements.

Slattery attempted to notify "everyone" that there would be an evidentiary hearing on the proposed settlement agreements. The trial court initially refused to approve the agreements because not all of the residuary members had signed them. The trial court determined that before it would approve the agreements, all of the residuary members would have to agree to the terms of the agreements. After Slattery obtained all of the necessary signatures, the trial court approved the two agreements. Slattery testified that the time expended in obtaining all the necessary signatures "probably exceeded the case preparation." In all, Slattery estimated that he spent approximately 104.8 hours on this case.

Lynn McHugh, copersonal representative of the Stull estate, was called to testify. According to McHugh, the Methodist property was sold for $98,432. Forty percent of that, or $38,827.23, was being held by the estate. The Midlands property was expected to sell for $150,656. According to McHugh, he had a purchaser for the property but there were some problems with the title, and he would not accept an offer until the title was clear. McHugh estimated that after both sales were complete, the estate would receive $98,274.99 pursuant to the settlement agreements. McHugh testified that there were approximately $7,000 in cash devises that had not been paid for lack of funds and stated that some of this money would be used to pay those off. The remaining funds were to be distributed to the residuary.

Other evidence was offered at the hearing which will be discussed later as necessary to our opinion. After hearing the evidence, the trial court determined that the common fund doctrine applied to this case and that the funds from the proceeds of the sales of the real estate was a common fund. The court found that the contingency fee agreement with Wolski was fair and reasonable. The court further found that the evidence supported Slattery's contention that he was entitled to "one-third of the amounts recovered for the residual class of devisees from the proceeds of the sell [sic] of the real estate." The objectors now appeal that decision.

### III. ASSIGNMENTS OF ERROR

Restated, the objectors allege that the trial court erred in determining that the common fund doctrine applies to this case and in awarding an excessive amount of attorney fees.

### IV. STANDARD OF REVIEW

In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Estate of Stephenson*, 243 Neb. 890, 503 N.W.2d 540 (1993).

In reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Goff-Hamel v. Obstetricians & Gyns., P.C.*, 256 Neb. 19, 588 N.W.2d 798 (1999).

## V. DISCUSSION

### 1. IS COMMON FUND DOCTRINE APPLICABLE?

Resolution of this case necessarily involves a determination of whether the common fund doctrine applies to the facts of this case. The determination of whether the common fund doctrine applies is a question of law, with respect to which this court must reach a conclusion independent of the trial court's ruling. See *In re Guardianship & Conservatorship of Bloomquist*, 246 Neb. 711, 523 N.W.2d 352 (1994); *Hauptman, O'Brien v. Milwaukee Guardian*, 7 Neb. App. 60, 578 N.W.2d 83 (1998).

▪ Ordinarily, the right of an attorney to compensation for his or her services depends upon a contract of employment, express or implied. But there are exceptions to this general rule. The common fund doctrine is a well-recognized exception to this general rule.

> Under the . . . "common fund" or "equitable fund" doctrine, the fee of an attorney whose services on behalf of a litigant operate to create, discover, increase, preserve, or protect a fund or property to which others also may have a claim may be ordered paid therefrom by a court of equity, or one exercising equitable jurisdiction.

7A C.J.S. *Attorney and Client* § 334 at 650 (1980).

> The doctrine is based on fairness to the successful litigant who might otherwise receive no benefit because his recovery might be consumed by the expenses, the correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery, the substantial benefit which is conferred on members of a class, and the encouragement of the attorney for the successful litigant, who will be more willing to prosecute litigation if he is assured that he will be promptly and directly compensated.

*Id.* at 652.

In Nebraska, the common fund doctrine has generally been applied in cases involving subrogation interests. See, *Hammond v. Nebraska Nat. Gas Co.*, 209 Neb. 616, 309 N.W.2d 75 (1981); *Moyer & Moyer v. State Farm Mut. Ins. Co.*, 190 Neb. 174, 206 N.W.2d 644 (1973); *Krause v. State Farm Mut. Auto. Ins. Co.*,

184 Neb. 588, 169 N.W.2d 601 (1969); *United Services Automobile Assn. v. Hills*, 172 Neb. 128, 109 N.W.2d 174 (1961); *Hauptman, O'Brien v. Milwaukee Guardian, supra*; *Neumann v. American Family Ins.*, 5 Neb. App. 704, 563 N.W.2d 791 (1997).

The rationale of these cases generally is twofold: it is *fair* to the successful litigant to require others to share the litigation expenses, and it is *unfair* for others to reap the benefits of such a fund without paying their share of the burden. The present case is more in the nature of a class of individuals which benefited from the attorney's work. Although Nebraska has never before applied the common fund doctrine in a suit where a class of beneficiaries is involved, we see no reason why this distinction should prohibit the application of the doctrine. See, e.g., *Dennis v. State*, 234 Neb. 427, 451 N.W.2d 676 (1990) (discussing common fund doctrine as requiring ascertainable class of beneficiaries and source of funds common to class); *In re Guardianship & Conservatorship of Bloomquist, supra* (holding that common fund doctrine is not dependent upon subrogation right). All of the parties agree that through Slattery's efforts, settlements were reached with Midlands and Methodist and that money which would not otherwise have been available will pass through the residuary estate. Stated another way, Slattery, on behalf of Wolski, created a fund in which others, the residuary members, now claim an interest. Accordingly, we find the common fund doctrine does apply to the facts at hand.

## 2. Does Exception Apply?

The objectors argue that the common fund doctrine is not applicable in this case because several of the residuary members had attorneys. Nebraska has held that the common fund doctrine is not applicable where the party sought to be charged has employed his or her own attorney, such attorney has *actively* participated in litigation, *and* such counsel has not terminated, abandoned, or acquiesced in the representation of his or her client by other counsel. *Hammond v. Nebraska Nat. Gas Co., supra*. To avoid paying fees under the theory that the third-party beneficiary was represented by counsel, the third party's counsel must have made a meaningful and ongoing contribution to

the pursuit of the third-party case, as opposed to a merely symbolic appearance. *Neumann v. American Family Ins., supra.*

The record reflects two of the objectors were represented by attorney Herbert Elworth for a period of time. An affidavit submitted by Elworth avers that he was aware that Slattery was representing Wolski, that "arrangements had been made for the payment of the fees by said residuary member from the recovery for the benefit of the residuary," and that after discussing fees with his clients, Elworth withdrew from their representation. Slattery testified that he was contacted by Elworth but that Elworth was not involved in the negotiations with Midlands and Methodist.

Slattery acknowledged that another attorney, Wyman Nelson, also made an appearance on behalf of one of the residuary members. According to Slattery, Nelson made his appearance after the settlement agreements had been reached and all but one of the beneficiaries had signed the agreements. Nelson questioned Slattery as to his theory of the case and various other items. Slattery subsequently received correspondence from Nelson indicating that Nelson had taken a position at another firm and that Slattery could contact Nelson's clients directly.

In sum, the objectors relied on Wolski's attorney to negotiate the settlements. Had Slattery not pursued the settlements, the residuary members would have received nothing. Although two attorneys did make nominal appearances, they did not actively participate in the will contest or settlement negotiations, and they "acquiesced" in Slattery's efforts. In fact, the objectors have conceded that the settlements were reached through the sole efforts of Slattery. Under these circumstances, it would be inequitable for the objectors to "reap the reward" without bearing any of the burden of achieving it. We find that Slattery is entitled to reasonable compensation from the fund.

### 3. Fees

When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *Barnett v. Peters*, 254 Neb. 74, 574 N.W.2d 487 (1998). The objectors argue that the trial court abused its discretion in

awarding attorney fees because it determined that Slattery was entitled to more than his contract with Wolski and because the amount awarded is not reasonable.

### (a) Can Fees Exceed Wolski's Contract?

Citing *Kaiman v. Mercy Midlands Medical & Dental Plan*, 1 Neb. App. 148, 491 N.W.2d 356 (1992), the objectors argue that the common fund doctrine is grounded in the notion of cost sharing and cannot be used to augment attorney fees. Thus, they contend that "[t]he Application of Mr. Slattery must be considered as an application of his client Rosie Wolski to have the other beneficiaries share in the fee that she has incurred in the course of the litigation [one-third of one-third of the settlement proceeds]." Brief for appellants at 15.

While it is true that this court applied similar reasoning in *Kaiman*, that case involved a subrogation interest in a workers' compensation case. Our decision was based upon the unique statutory framework of the Nebraska Workers' Compensation Act and case law involving subrogation interests. The present case does not involve a subrogation interest and is not a workers' compensation case, and the authority and reasoning set forth in *Kaiman* is inapplicable to the facts at hand. Indeed, such a premise is contrary to the underlying principles of the common fund doctrine: first, it presumes that the right to seek "reimbursement" of attorney fees necessarily belongs to the client, and second, it presumes the efforts of the attorney, to the extent those efforts create a benefit greater than only to his or her client, have no value.

"The [common fund] doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980). Since the inception of the common fund doctrine, courts have uniformly permitted attorneys to augment their fees through the common fund. See *Central Railroad v. Pettus*, 113 U.S. 116, 5 S. Ct. 387, 28 L. Ed. 915 (1885).

In *Pettus*, the Western Railroad Co. (Western) purchased the Montgomery and West Point Railroad Co. (Montgomery).

Unsecured bonds were issued to creditors of Montgomery. Western subsequently executed a mortgage on its property, including that purchased from Montgomery, to Morris and Lowery, trustees. The trustees subsequently sued to foreclose its mortgage. The Central Railroad Co. (Central) purchased the property and asserted that it was entitled to hold the assets free and clear of any claims of unsecured creditors of Montgomery. The unsecured creditors resided in several different states, and their aggregate claims were substantial.

Several of the unsecured creditors (petitioners) sued, and a decree was entered finding that the unsecured creditors of Montgomery had a lien upon the property originally purchased from Montgomery. The property was ordered to be sold to satisfy its debts according to priority. Pettus & Dawson and Watts & Sons (Pettus), attorneys for the petitioners, also filed a claim against the Montgomery property for payment of attorney fees on behalf of the unrepresented unsecured creditors who benefited from their actions. Central was a party because it had purchased or settled claims of many of the unsecured creditors, and Pettus claimed that Central was an assignee " 'of a part of each claim as filed to the amount of the reasonable value of the services rendered in said cause by petitioners for the benefit of each holder and owner of such claims . . . .' " 113 U.S. at 120-21. The fees were granted, and Central appealed.

The U.S. Supreme Court first addressed whether the attorneys could bring an action on their own behalf. The Court held that "when an allowance to the complainant is proper on account of solicitors' fees, it may be made directly to the solicitors themselves, without any application by their immediate client." 113 U.S. at 124-25.

The Supreme Court next addressed Central's argument that the attorneys were not entitled to fees greater than those for which they had contracted with their clients. The Supreme Court expressly rejected this argument and held that under the doctrine, the attorneys were entitled to a reasonable fee for the services rendered on behalf of the unrepresented unsecured creditors. See, also, *In re Coordinated Pretrial Proceedings*, 109 F.3d 602 (9th Cir. 1997); *Lindy Bros. Builders, Inc. v. AM. Radiator, Etc.*, 540 F.2d 102 (3d Cir. 1976); *In re Agent Orange*

*Product Liability Litigation*, 611 F. Supp. 1296 (E.D.N.Y. 1985); John P. Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation*, 88 Harv. L. Rev. 849 (1975); John P. Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Harv. L. Rev. 1597 (1974).

█ In awarding attorney fees out of a common fund, a trial court is not bound by the contract between the attorney and the client. For the above reasons, we reject the objectors' argument that in awarding attorney fees, the trial court is limited to the amount due Slattery under the contract between Wolski and Slattery. Indeed, the trial court is not bound by that contract in any respect in its determination of a reasonable fee. See *Krause v. State Farm Mut. Auto. Ins. Co.*, 184 Neb. 588, 169 N.W.2d 601 (1969) (holding that amount to be allowed for attorney fees from third-party beneficiaries depends on consideration of totality of circumstances and third-party beneficiary is not bound by contractual agreement entered into between client and his or her attorney).

### (b) What is Reasonable Fee?

In common fund cases, once the attorneys secure a settlement for the class, they petition the court for compensation from the same fund. Thus, their "role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit." [Citation omitted.] The court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications.

*Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988).

"The court has a responsibility to award a fair and just allowance to counsel, but the award must be made with full recognition of the position of the court as quasi-trustee of a fund to which absent and unrepresented claimants are entitled." 7A C.J.S., *supra*, § 335 at 658.

█ We have said that in determining a reasonable amount of attorney fees in a common fund context, a court should consider the services actually performed, the amount in controversy, the nature of the case, the results obtained, the extent of preparation

of the case, the difficulty of the questions involved, the skill required, the customary charges of the bar for similar work, and the character and standing of the attorney. See *Hauptman, O'Brien v. Milwaukee Guardian*, 7 Neb. App. 60, 578 N.W.2d 83 (1998). See, also, *Koehler v. Farmers Alliance Mut. Ins. Co.*, 252 Neb. 712, 566 N.W.2d 750 (1997).

The objectors complain that the trial court abused its discretion in awarding Slattery one-third of the total fund, or approximately $32,830.37, particularly in light of the fact that that amount is three times the fee Slattery contracted for.

Slattery's hourly rate is $125, and his records, made in preparation of trial, reflect that he put in approximately 104.8 hours on this case, much of which was apparently clerical work of notifying heirs and obtaining their signatures on the settlement agreements. In fact, more than one-quarter of Slattery's time was spent in tasks related to obtaining the signatures of the beneficiaries. According to Slattery, the "time and energies" expended obtaining signatures "probably exceeded the case preparation." Slattery also testified that his staff assisted in obtaining the signatures, but his timesheet fails to break down the hours that Slattery spent on this task and the hours spent by his staff.

Our record contains no evidence regarding the difficulty of the questions involved, the extent of any litigation actually undertaken, or Slattery's skill or expertise in this area. Slattery initially challenged the will on the grounds of undue influence. Several months later, Slattery realized that was not a viable claim, so he attempted to challenge the will on the ground it violated the rule against perpetuities. Counsel for Slattery asked the trial court to take judicial notice of "the entire Probate file." Although a court may properly take judicial notice of pleadings and court orders in a case, see *In re Interest of Tabitha J.*, 5 Neb. App. 609, 561 N.W.2d 252 (1997), none of the pleadings pertaining to the "will contest" proceedings initiated by Slattery have been made a part of our record.

Slattery testified that the case was complex, but our record contains little other evidence to support this conclusion. As stated, the "case" is not in our record. Slattery testified that Midlands and Methodist initially resisted his motion to set aside

the will. However, the nature of the restrictions placed on the devisees might lead to the reasonable inference that Midlands' and Methodist's "resistance" to settlements, which offered them an immediate cash payment instead of real estate that could never be sold, was perhaps little more than obligatory. In short, our record contains no *direct* evidence of the nature of the resistance encountered by Slattery from Midlands and Methodist. But, there is some *circumstantial* evidence which we will discuss.

When Wolski initially retained Slattery, she agreed to pay him an hourly rate. It was not until almost 6 months later, after negotiations with Midlands and Methodist had already begun, that the new contingency fee agreement with Wolski was made by Slattery. Slattery testified that when Elworth made his first appearance, Slattery was already negotiating settlement amounts with Midlands and Methodist and that indeed, the settlement agreements may have already been structured. This was only 3 weeks after the contingency agreement was signed. From this, several inferences may be drawn, including that much of Slattery's legal efforts toward the settlement agreements had been expended under the hourly fee agreement with Wolski, that the settlements proposed were well received by Midlands and Methodist, or that Slattery was very skillful in such matters and was thus able to conclude it with inordinate speed.

Terry Sibbernsen, an Omaha attorney, was called to testify on behalf of Slattery. Sibbernsen explained what a contingency fee agreement is and how it can be beneficial to a client. Sibbernsen testified that fees in contingency fee agreements range anywhere from one-third to one-half of the amount collected. Sibbernsen believes that a one-third fee is an appropriate charge for an attorney. According to Sibbernsen, contingency agreements are not uncommon in proceedings to contest a will.

Sibbernsen had reviewed Slattery's contract with Wolski and stated that the language used in the contingency agreement was appropriate and was the same language used by his office. Sibbernsen testified that he had reviewed Slattery's file on this case and opined that

it was a somewhat complex piece of litigation with a — the unknown factor is when Mr. Slattery first filed this . . .

objection, there was certainly no guarantee that he would succeed on his request and so he was going into — you know — a venture into unknown water[s] and he obtained a good result for his clients.

Sibbernsen's testimony about contingency fee agreements in general and the reasonableness of the one between Wolski and Slattery in particular went unrefuted at the hearing. However, his testimony is silent as to several noteworthy factors. First and foremost, he never directly testified that the fee of nearly $33,000 for the services performed by Slattery in this matter was reasonable. Second, he was never asked to address many, if any, of the factors deemed salient in *Hauptman, O'Brien v. Milwaukee Guardian*, 7 Neb. App. 60, 578 N.W.2d 83 (1998), and *Koehler v. Farmers Alliance Mut. Ins. Co.*, 252 Neb. 712, 566 N.W.2d 750 (1997), except for a passing reference to the "somewhat complex piece of litigation." We are aware that the *Hauptman, O'Brien* opinion had not been filed as of the date of the hearing below. Nonetheless, *Hauptman, O'Brien* is grounded on established precedent in attorney fee matters, and the factors are surely material in this case.

Finally, and critically important in reviewing Sibbernsen's testimony, we must be mindful that the reasonableness of Wolski's fee agreement is not the issue before the court. Similarly, the issue was not whether a one-third contingency fee arrangement between Slattery and the objectors *would* have been reasonable had it been agreed to. Obviously, the very lack of such agreement is what triggered Slattery's application to begin with. Rather, the issue presented was: What is a reasonable attorney fee to be paid from the common fund under the totality of the circumstances? That question is not answered by simply applying the fee arrangement made by one of the beneficiaries of the fund. See *Krause v. State Farm Mut. Auto. Ins. Co.*, 184 Neb. 588, 169 N.W.2d 601 (1969). Thus, while instructive, Sibbernsen's testimony is not sufficient to establish that an attorney fee of nearly $33,000 was reasonable in this case.

Based on the foregoing, we conclude that the decision of the trial court awarding Slattery fees in the amount of one-third of the entire fund was erroneous. When the record is sufficiently developed that a reviewing court can apply the law to the facts

and calculate a fair and reasonable attorney fee without resorting to remand, that route is available to the appellate court. *Cedars Corp. v. Sun Valley Dev. Co.*, 253 Neb. 999, 573 N.W.2d 467 (1998). As indicated above, the record is not sufficiently developed as to many of the factors necessary to the calculation of a fair and reasonable fee in this matter. Accordingly, the matter is remanded for purposes of the court taking additional evidence on the fee issue. See, e.g., *Neumann v. American Family Ins.*, 5 Neb. App. 704, 563 N.W.2d 791 (1997).

For the sake of completeness, we note that the trial court specifically found that Slattery's fee application was, in fact, an application on behalf of Wolski, Slattery's "contracted client," to have "all residual devisees share in the fee *she ha[d] incurred* . . . ." (Emphasis supplied.) The court then found that the contingency fee agreement between Slattery and Wolski was fair and reasonable and determined that Slattery was entitled to "a fee equal to one-third of the amounts recovered for the residual class of devisees from the proceeds of the sell [sic] of the real estate."

It seems apparent that the trial court's determination of attorney fees was based upon the premise that Wolski's contract with Slattery obligated her to pay him one-third of *all* amounts by which the residuary estate was increased. Such an interpretation of the fee agreement is erroneous. It would result in Wolski owing Slattery her *entire* one-third share of the residuary estate instead of one-third of the amounts recovered for her as the fee agreement contemplates. Instead, and as acknowledged at oral arguments by Slattery's counsel, Wolski's agreement obligated her to pay only one-third of the amounts recovered for her, not one-third of the total increase in the residuary estate resulting from the settlement. Thus, while it was proper for the trial court to consider the fees owed under the agreement in determining a reasonable fee from the common fund, the court erred in determining that Wolski's contract obligated her to pay one-third of all amounts recovered.

Our comments on the evidence presented to date are intended solely to explain our conclusion that the trial court's determination of fees was an abuse of discretion. We do not intend to prejudge what that fee should be. We direct only that it be deter-

mined in accordance with the principles enumerated in this opinion and that it be apportioned pro rata among the residuary members by payment from the sales proceeds.

### 4. EQUITABLE ESTOPPEL

The objectors' final argument is that Slattery is equitably estopped from asserting his claims for fees because when he obtained the signatures of the residuary members on the settlement agreements, he did not inform them that he would be seeking attorney fees from that fund. Equitable estoppel is an affirmative defense. See *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989). An affirmative defense must be raised in the pleadings to be considered by a trial court and on appeal. *Nebraska Pub. Emp. v. City of Omaha*, 244 Neb. 328, 506 N.W.2d 686 (1993). An affirmative defense not raised or litigated in the trial court cannot be raised for the first time on appeal. *Id.* The objectors did not plead or litigate this defense, and accordingly, we cannot consider it on appeal.

### VI. CONCLUSION

The trial court correctly determined that the common fund doctrine applies in this case and that Slattery is entitled to attorney fees from the fund. However, because the evidence failed to address the factors identified in the cases cited herein on the issue of the value of his services, the matter is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.